## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WILLIAM MYRE, and SHERI MYRE,
as co-personal representatives of the Estate
of T.M., *Deceased*,

CRAIG SHILLING, and JILL SOAVE,
as co-personal representatives of the Estate of
J.S., *Deceased;*

CHAD GREGORY, as Next Friend for
K.G., a minor,

LAUREN ALIANO, as Next Friend for S.K.,
a minor and G.K., a minor,

LAURA LUCAS, as Next Friend for A.S.,
a minor,

                Plaintiffs,

v.

OXFORD COMMUNITY SCHOOL DISTRICT;
SUPERINTENDENT TIMOTHY THRONE;
PRINCIPAL STEVEN WOLF; DEAN OF
STUDENTS NICHOLAS EJAK;
STUDENT COUNSELOR SHAWN HOPKINS;
SUPERINTENDENT KENNETH WEAVER;
TEACHER PAM PARKER FINE; TEACHER
JACQUELINE KUBINA; TEACHER
BECKY MORGAN; and TEACHER ALLISON
KARPINSKI.

                Defendants.

_____/

Case No.: 2:22-cv-11113

U.S District Judge:
Mark A. Goldsmith

U.S. Magistrate Judge:
Anthony P. Patti

1

VEN JOHNSON (P39219)
JEFFREY T. STEWART (P24138)
KANWARPREET S. KHAHRA (P80253)
CHRISTOPHER DESMOND (P71493)
JOHNSON LAW, PLC
Attorneys for Plaintiffs
535 Griswold St. Ste 2600
Detroit, MI 48226
Ph: (313) 324-8300/ Fax: 8301
vjohnson@venjohnsonlaw.com
jstewart@venjohnsonlaw.com
kkhahra@venjohnsonlaw.com
cdesmond@venjohnsonlaw.com

_____/

**There are three other lawsuits, which are identified below
that arise out of the same transaction or occurrence:**

**2:22-cv-10805-TGB-KGA filed on 04/14/2022**

**2:22-cv-10407-SFC-CI filed on 02/24/2022**

**2:21-cv-12871-MAG-APP filed on 12/09/2021**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COME, the Plaintiffs, WILLIAM MYRE and SHERI MYRE, as co-personal representatives of the Estate of T.M., *Deceased*; Craig Shilling and Jill Soave, as co-personal representatives of the Estate of J.S., *Deceased*; CHAD GREGORY, as Next Friend for K.G., a minor; LAUREN ALIANO, as Next Friend for S.K., a minor, and G.K., a minor; LAURA LUCAS, as Next Friend for A.S., a minor, by and through their attorneys, JOHNSON LAW, PLC, and for their Complaint and cause of action against the Defendants, state the following:

2

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C §§ 1983 and 1988, and under the statutes and common law of the State of Michigan.

2.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 42 U.S.C § 1983.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(d) because the parties reside in the Eastern District of Michigan and the acts or omissions alleged in this Complaint occurred in Oakland County, Michigan.

## THE PLAINTIFFS

4.      At all times relevant to this Complaint, T.M. was a minor who lived with his parents, WILLIAM ("BUCK") MYRE and SHERI MYRE ("SHERI"), who have been duly appointed as co-personal representatives of the Estate of T.M.

5.      At all times relevant to this Complaint, J.S. was a minor living with his mother. Both his parents, CRAIG SHILLING ("CRAIG") and JILL SOAVE ("JILL"), have been duly appointed as co-personal representatives of the Estate of J.S.

6.      At all times relevant to this Complaint, K.G. was a minor lived with his

parents. CHAD GREGORY ("CHAD") has been appointed as Next Friend for K.G.

7.     At all times relevant to this Complaint, S.K. and G.K. were minors who lived with their mother, LAUREN ALIANO ("LAUREN"), who has been appointed as Next Friend for S.K. and G.K.

8.     At all times relevant to this Complaint, A.S. was a minor lived with her mother, LAURA LUCAS ("LAURA"), who is being appointed as Next Friend for A.S., with the filing of this Complaint.

9.     All Plaintiffs herein are believed to be residents of Oxford, Oakland County, Michigan.

## THE OXFORD DEFENDANTS

10.     At all times relevant to this Complaint, the Oxford Community School District ("OCSD") was a municipal corporation, duly organized and carrying out functions in the Oxford, Michigan. These functions included, but were not limited to organizing, teaching, operating, staffing, training, and supervising the staff, counselors, teachers at Oxford High School ("OHS") and maintaining safety and security protocol for education and general welfare of OCSD students. OHS was a secondary school, operating as an integral part of the OCSD. The claims against OCSD are premised on 42 U.S.C. § 1983 relating to its official policies, practices, and customs, which were the motivating force and cause-in-fact for the decision to

return the shooter, E.C., from the safety and security of counselor's office to the classroom on November 30, 2021.

4.      Defendant, Timothy Throne ("Throne"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Superintendent of the OCSD.

5.      Defendant, Steven Wolf ("Wolf"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Principal of OHS in the OCSD.

6.      Defendant, Nicholas Ejak ("Ejak"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as the Dean of Students in the OCSD.

7.      Defendant, Shawn Hopkins ("Hopkins"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of her employment as a Counselor at OHS in the OCSD.

11.     Defendant, Pam Parker Fine ("Fine"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of her employment as a teacher at OHS in the OCSD.

12.     Defendant, Jacqueline Kubina ("Kubina"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of

her employment as a teacher at OHS in the OCSD.

13.     Defendant, Becky Morgan ("Morgan"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of her employment as a teacher at OHS in the OCSD.

14.     Defendant, Allison Karpinski ("Karpinski"), is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of her employment as a teacher at OHS in the OCSD.

## STATEMENT OF FACTS

15.     Each day approximately eight (8) children die from gun violence in the U.S. and approximately thirty-two (32) are shot and injured[1].

16.     Guns are the leading cause of death among American children and teens with one out of ten-gun related deaths occurring in children under the age of 19[2].

17.     Based on a 2015 National survey, an estimated of 4.6 million American children live in a home where at least one gun is kept loaded and unlocked[3].

---

[1] https://www.sandyhookpromise.org/gun-violence/16-facts-about-gun-violence-and-school-shootings; https://www.cdc.gov/injury/wisqars/index.html.

[2] https://www.sandyhookpromise.org/gun-violence/16-facts-about-gun-violence-and-school-shootings; https://efsgv.org/wp-content/uploads/2019CDCdata.pdf, A Public Health Crisis Decades in the Making: A Review of 2019 CDC Gun Mortality Data, Feb. 2021.

[3] https://www.sandyhookpromise.org/gun-violence/16-facts-about-gun-violence-and-school-shootings; Azrael, D., Cohen, J., Salhi, C. et al. J Urban Health (2018) 95: 295. https://doi.org/10.1007/s11524-018-0261-7 Accessed on 05/19/22&nbsp

18.     There have been approximately 1316 school shootings in the U.S. since 1970 with approximately 18% of the school shootings having occurred since the tragedy at Sandy Hook Elementary School in December 2012[4].

19.     A comprehensive study conducted by the Secret Service and Department of Education revealed that approximately 93% of school shooters had planned their attack in advance[5].

20.     This study also revealed that in majority of the school shootings, at least one other person had knowledge of the attack and in approximately 68% of the gun-related incidents at schools, the gun was taken from home, a friend, or a relative.

21.     In another study conducted by the Federal Bureau of Investigation and U.S. Department of Justice (hereinafter "the FBI" study), the research had revealed that approximately 77% of active shooters spent a week or longer planning their attack[6].

22.     The FBI study also reported that there were warning signs present in every documented active shooter.

---

[4] https://www.sandyhookpromise.org/gun-violence/16-facts-about-gun-violence-and-school-shootings; https://www.thetrace.org/2019/08/children-teens-gun-deaths-data.

[5] https://www.sandyhookpromise.org/gun-violence/16-facts-about-gun-violence-and-school-shootings; Vossekuil, et al, 2002.

[6] https://www.sandyhookpromise.org/gun-violence/16-facts-about-gun-violence-and-school-shootings; Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.

23.     In August 2020, the U.S. Department of Homeland Security and the National Threat Assessment Center published a 36-page report in which the authors unequivocally stated that the shooters often exhibited threatening or concerning behavior and other stressors and that professionals with the proper training to recognize the warnings signs can timely intervene and redirect troubling behavior before the violence occurs[7].

24.     A recent study of 134 school shootings and attempted school shootings found that 91% of the shooters were students or former students, 87% were in crisis before the shooting and 80% were suicidal before the attack[8].

25.     The State of Michigan, in recognition of the risks of school mass shootings and gun violence, had enacted legislation mandating that school districts to adopt school safety policies. This legislation includes the Child Protection Law, MCL 722.621 (1975); Statewide School Safety Information Policy, MCL 380.1308 (1999); Mandatory incident reporting to state police for certain crimes occurring at school, MCL 380.1308a (2019); Liaison for school safety commission requirements, MCL 380.1241 (2019); Office of School Safety, MCL 28.681 (2019); Reporting of

---

[7] National Threat Assessment Center. (2020). Mass Attacks in Public Spaces – 2019. U.S. Secret Service, Department of Homeland Security.

[8] *Key Findings: Analyses of School and Workplace Shootings*, THE VIOLENCE PROJECT, (2019 Data) https://www.theviolenceproject.org/mass-shooter-database-3/key-findings/.

Crimes on the District's Website, MCL 38.1310a (2000); Student Safety Act, MCL 752.911 (2000); Save Our Students Act, MCL 380.1893 (2020); Searching Student Lockers, MCL 380.1306 (2000); and Student in Possession of a Dangerous Weapon, MCL 380.1313 (1987).

26.    Unfortunately, gun violence in a school setting is a foreseeable risk, which creates a duty on the school officials and administrators to identify warning signs and redirect troubling behavior before the violence occurs.

27.    Eliminating or mitigating the risk of gun violence in schools is an integral part of operating a school district and the responsibility of maintaining school safety is on school administrators, teachers, counselors, and other school officials pursuant to state and federal law.

28.    Over the course of the school year 2020-2021, when E.C. was a freshman**,** through approximately June 2021, until such time as he became a sophomore and returned to OHS in September 2021, E.C. exhibited some concerning, strange and bizarre behavior which should have alerted his parents and school officials who had extensive contact with him, that he was suffering from significant psychiatric problems, and that he might have been subject to child abuse and/or neglect by his parents.

29.    In March 2021, on multiple occasions, E.C. exchanged text messages

9

with his mother, Jennifer Crumbley (hereinafter "Mrs. Crumbley"), wherein he indicated that he was afraid that there were demons, ghosts, and someone else in the home. These messages were sent when E.C. was at home alone and the Crumbley parents were either at work or away from home for some other reason.

30.    Despite these concerning potential hallucinations and/or delusions, the Crumbley parents did not get E.C. any medical or psychiatric treatment.

31.    In May 2021, E.C. tortured and killed animals and videotaped these events on his cell phone, which was given to him by his parents.

32.    One such animal was a bird, whose head E.C. kept in a jar in his bedroom for several months, which would have been clearly visible to his parents. The Crumbley parents knew or should have known about this incident.

33.    During this period of time, E.C. was keeping a journal and recording videos of himself, wherein he discussed about his plan to shoot up the school.

34.    E.C. was so distraught and upset with his life, in and out of school, that he stopped doing homework and wrote in his journal on how shocked he was that his parents did not notice his behavior nor cared about it.

35.    Throughout this same period of time, E.C. searched on his computer and/or cell phone on multiple occasions for "school shootings" and firearms in general.   This research was so extensive that he began receiving notifications

10

regarding mental health and the purchase or use of firearms.

36.  This behavior was known or would have been known to his parents, had they reviewed E.C.'s search history on his computer and/or cell phone.

37.  E.C. researched Nazi propaganda on the internet on multiple occasions, which also would have been known or should have been known to his parents from his computer and/or phone at home.

38.  In that same period of time, E.C. repeatedly asked his parents to buy him a 9 mm handgun and take him to a shooting range.

39.  In August of 2021, E.C. recorded a video that he sent to one of his OHS classmates, which showed E.C. holding a gun, and said, "It's time to shoot up the school! JK JK JK." The gun was his father's 22 caliber handgun clearing indicating that E.C. had unfettered access to his parents' firearms without any limitations or repercussions.

40.  As with the other threatening and concerning behaviors described above, this video and statement were on his computer and/or cell phone, and thus were known or should have been known to his parents.

41.  In October of 2021, a month after E.C. returned to OHS as a sophomore, E.C. became incredibly sad about his best friend leaving OHS. The Crumbley parents were aware of this and knew how upset he was about it.

42.    Despite the above-described concerning behavior, which should have alerted the Crumbley parents to the fact that their son was engaged in some concerning, suicidal or homicidal behavior, and needed an immediate medical or psychiatric evaluation and treatment, the Crumbley parents failed to obtain such help for E.C.  Their failure or refusal to get help for E.C. was so significant that it rose to the level of child abuse and neglect.

43.    E.C. became part of counselor Hopkins case load in Fall of 2020, his freshman year.

44.    In months leading up to the shooting, E.C. was known to OHS teachers, counselors, and administrators for his concerning behavior that indicated psychiatric distress, suicidal or homicidal tendencies, and the possibility of child abuse and neglect.

45.    In early November 2021, Hopkins received an email from E.C.'s Spanish teacher that E.C. appeared sad.

46.    Hopkins checked-in with E.C. and told him that he was available if E.C. wanted to talk.

47.    On November 11, 2021, E.C. brought a severed bird's head to OHS and placed it in the boy's bathroom.

48.    Other students found and reported the bird's head to school

12

administrators, including OHS principal, Steven Wolf. OCSD administrators concealed this information from staff and parents.

49.    On November 12, 2021, OHS administration sent an email to parents of OHS students stating, "Please know that we have reviewed every concern shared with us and investigated all information provided … We want our parents and students to know that there has been no threat to our building nor our students."

50.    On or around November 16, 2021, several parents raised concerns about threats to students made on social media and concerns about multiple severed animal heads at OHS to Wolf.

51.    Students and parents recognized the presence of a violent threat in mid-November 2021, but OCSD dismissed it as being not credible.

52.    On November 16, 2021, Wolf sent an email to parents confirming that there was no threat at OHS and large assumptions made on social media were merely exaggerated rumors.

53.    On November 16, 2021, Throne also made an announcement on school loudspeaker instructing the students to stop spreading rumors and confirmed that there was no threat or danger to any student at OHS.

54.    On November 26, 2021, four days before the OHS shooting, James Crumbley and E.C. went to a local gun dealer and purchased a Sig Saur 9 mm semi-

13

automatic handgun ("the handgun"), which, upon information and belief, they openly referred to as E.C.'s gun in front of the salesperson.

55.     Later that day E.C. posted a photo of himself with his new gun.

56.     On November 27, 2021, three days before the OHS shooting, Mrs. Crumbley, at E.C.'s request, took E.C. to a local gun shooting range so that E.C. could fire "his" new handgun, load it with ammunition, practice shooting it, as well as learn its other operations, including loading, reloading and firing.

57.     That same day, Mrs. Crumbley posted a picture of E.C. and his "new Christmas present," clearly referring to the Sig Sauer handgun.

58.     Upon information and belief, at the conclusion of the firearm practice, E.C.'s handgun was stored in his parents' bedroom drawer, and was either not locked, or if it was locked, E.C. was given the ability to unlock it; hence, the handgun was easily accessible to him at will.

59.     Two days later, on Monday, November 29, 2021, the day before the OHS shootings and murders, E.C. was in the classroom of Kubina who caught E.C. looking at ammunition for his gun on his cell phone in violation of a variety of school rules, procedures, and policies.

60.     Upon information and belief, Kubina was so concerned by this behavior that she took a picture on her cell phone of the ammunition that E.C. was

searching.

61.    Out of serious concerns for E.C.'s and others' safety, Kubina took E.C. to the counseling office, where E.C. was left with Pamela Parker Fine.

62.    Parker Fine was given a copy of the photograph taken by Kubina, showing the ammunition for E.C.'s gun. Parker Fine called Mrs. Crumbley to discuss this concerning behavior and left a voicemail requesting the parents to return her call. Neither parent returned the call, nor did they discuss E.C.'s above-referenced violent and concerning behavior with Parker Fine.

63.    In addition to E.C. looking up ammunition on his cell phone, other students saw E.C. on November 29, 2021, with shell casings and live ammunition rounds at OHS.

64.    The ammunition research, coupled with the refusal of the Crumbley parents to respond to Parker Fine, gave her reasonable cause to suspect child abuse and neglect. As such, Parker Fine was required under the Michigan's Child Protection Act, MCL 722.623, et seq, to contact the Child Protective Services ("CPS").

65.    The risk posed by E.C. also required that Parker Fine notify the police, namely the OHS liaison officer, Oakland County Deputy Jason Louwaert that E.C. was a victim of child abuse and neglect and posed a threat to himself and others.

66.     At no time did Kubina or Parker Fine reported this information to CPS or local law enforcement, as required by the Michigan's Child Protection Act; hence they both violated that law.

67.     Instead of returning Parker Fine's phone call, Mrs. Crumbley texted her son later that day and asked, "Did you show them a picture of your gun?" "LOL, I'm not gonna get mad at you, you have to learn to not get caught."

68.     Despite learning about the ammunition search that day, the Crumbley parents did not take any action to secure E.C.'s handgun, nor did they intercede in any way relative to taking E.C. to a counselor, psychiatric facility, emergency room, or other mental health care provider.

69.     On Tuesday, November 30, 2021, the morning of the unforgettable and tragic day of the shooting, E.C. returned to school and was in Morgan's classroom with a handgun and approximately 48 rounds of ammunition in his backpack.

70.     E.C. was doing a Chapter 5 "Test Review" while he was in math class at 8:59 AM. Instead of utilizing the test document to review for an upcoming test, E.C. drew a picture of his 9 mm handgun. *See* Exhibit 1, p 1, which shows the original drawings, followed by E.C.'s attempts to change the drawings to hide their sinister content (Exhibit 1, pp 2-3). Immediately underneath it, he wrote, "The thoughts won't stop. Help me." To the right of that, he drew a person who clearly

has two gunshot wounds: one in the chest, one in the abdomen with blood coming from his mouth. To the right of that the statement, he wrote "blood everywhere" and underneath that, there is a hand-drawn shell casing or bullet. In another part of the same document, EC drew a laughing face with tears, and wrote "My life is useless" and "The world is dead."

71.    The drawing and statements were clearly so violent and disturbing; were an obvious cry for help; and openly expressed E.C.'s thoughts of violence against himself and/or others.

72.    Morgan became so understandably alarmed by seeing these clearly violent tendencies and violent behaviors, that she took a picture of same on her cell phone and forwarded that to Hopkins and Ejak.

73.    Subsequently, Karpinski saw E.C. looking up violent videos that depicted a shooting. She and Morgan both reported this behavior to Hopkins.

74.    E.C. knew that he would be questioned so he doctored the drawing and wrote, "Video game this is," "I love my life so much !!!!," "OHS rocks!," "We are all friends here," and "Harmless act." (Exhibit 2).

75.    At some point thereafter, Ejak went to Hopkins office and informed him about the drawing, which Hopkins had not seen at that point. Following this, Hopkins went to E.C.'s classroom to get him out of the classroom and have a

meeting with him.

76.     Upon information and belief, Wolf and Throne were notified about this incident, putting them on alert of further threat.

77.     Hopkins grabbed the math assignment from E.C.'s desk and E.C. followed Hopkins to his office where Ejak was waiting for them. E.C.'s backpack remained in the classroom.

78.     Ejak returned to the math classroom and retrieved E.C.'s backpack, which contained a handgun and 48 rounds of ammunition.

79.     At this point, Hopkins had not seen the original drawing and only had a doctored version.

80.     Hopkins began questioning E.C. about the drawing, at which point he was informed by E.C. that it was just a drawing for a video game.

81.     After questioning E.C. about the specifics of the drawing, in particular, "my life is useless," Hopkins noticed that E.C.'s demeanor changed from being calm and compliant to being sad and started pausing more in his speech.

82.     E.C. spoke about family dog dying, losing a grandparent, pandemic and difficulty being out of school, a close friend who had left and was not able to attend school anymore, and argument about grades with his parents the previous night.

83.     Based on this conversation, Hopkins determined that there was

sufficient evidence of suicidal ideation and called Mrs. Crumbley for an immediate meeting.

84.    Approximately 20 minutes later, Hopkins received the original math drawing.

85.    At approximately 10:30 a.m., the Crumbley parents arrived for a meeting. Hopkins observed that they were not friendly nor showing any care for E.C. They did not greet, touch, or hug E.C.

86.    During the meeting, Hopkins showed the drawing to the Crumbley parents and advised them that E.C. need mental health support that day. Hopkins knew that E.C. need immediate psychiatric intervention and evaluation based on his training and experience.

87.    The Crumbley parents refused to take E.C. out of school citing work reasons.

88.    Hopkins had never seen a parent refuse to take their child home in a situation like this before. Notwithstanding that, Hopkins advised the parents that if they did not take E.C. to counseling within 48 hours, he would be following up.

89.    After 15 minutes into the meeting, Mrs. Crumbley said to Hopkins – "Are we done."

90.    Hopkins looked at Ejak and asked him, "if there was any disciplinary

reason why [the] student could not return to class."

91.     Ejak responded, "no."

92.     Hopkins then said, "I guess we are done." Hopkins and Ejak knew that their meeting with E.C.'s parents worsened E.C.'s emotional and psychiatric condition.

93.     Following the meeting, E.C. was allowed to return to his class despite his concerning behavior.

94.     Hopkins and Ejak returned the backpack to E.C. without searching it despite having reasonable cause to do so. Furthermore, Hopkins and Ejak did not get the liaison officer or local law enforcement involved who would have search the backpack.

95.     Hopkins and Ejak knew that the Crumbley parents' refusal to address the emergent medical situation concerning E.C. was evidence of child abuse and neglect, which required immediate reporting under the Michigan Child Protection Act as E.C. continued to be a grave risk of harm to himself and others.

96.     At approximately 12:51 p.m., E.C. began his mass shooting killing four students including, T.M. and J.S., and injuring several others.

97.     Based on the drawings and statements, as well as the direct knowledge of Parker Fine's involvement with E.C. the previous day, Morgan, Karpinski, Ejak,

and Hopkins had reasonable cause to suspect child abuse and neglect and were required to report same to CPS and local law enforcement, including Deputy Jason Louwaert, the school liaison officer.

98.    Ejak and Hopkins deliberately conducted a meeting with E.C. and his parents in the absence of safety liaison officer or other local law enforcement personnel, thereby preventing a proper and through investigation and lawful search of E.C.'s backpack, which would have prevented this tragedy.

99.    The affirmative acts of Kubina, Morgan, Karpinski, Parker Fine, Hopkins, and Ejak as alleged in the foregoing allegations of this Complaint, greatly increased the danger posed by E.C. and rendered the environment for the Plaintiffs and other students unsafe.

100.    At approximately 12:52 p.m., the authorities were notified of an active shooter at OHS.

101.    E.C.'s massacre was subsequently halted when he was apprehended by law enforcement.

102.    On December 1, 2021, E.C. was arraigned and charged as an adult with one count of terrorism causing death, four counts of first-degree murder, seven counts of assault with intent to murder, and twelve counts of possession of a firearm in the commission of a felony.

103.   By reason of the knowledge that the Oxford Defendants possessed before the shootings began on November 30, 2021, it was foreseeable that E.C. would carry out such acts of violence on the Plaintiffs and others similarly situated.

104.   The Defendants' affirmative actions were reckless and put the minor Plaintiffs and the Decedents herein at substantial risk of serious and immediate harm.

105.   The Defendants knew or should have known that their actions would endanger the minor Plaintiffs and Decedents herein and other students at Oxford High School.

106.   The OCSD and OHS had a written policy implemented in March of 2011 entitled, Suicide Intervention Process, which addressed suicide prevention. The policy specifically described the process which included *inter alia*, (1) assessing the risk of suicide; (2) conversing with the student to determine if he or she has any dangerous instrumentality such as, a weapon, substance, or other material capable of inflicting mortal wound, on his or her person; (3) timely intervening and removing the student away from other students.

107.   All Oxford Defendants knew or should have known about policies, procedures, and customs at OHS and OCSD regarding dealing with suicidal or homicidal ideation and mandatory reporting under the Michigan Child Protection

Act.

## COUNT I: ALL PLAINTIFFS AGAINST OXFORD DEFENDANTS FOR VIOLATION OF CIVIL RIGHTS UNDER THE FOURTEETH AMENDMENT TO THE CONSTITUTION AND 42 U.S.C. § 1983, 1988 STATE CREATED DANGER.

108.   The Plaintiffs reallege, restate, and incorporate by reference each and every paragraph stated above, as though fully state herein, and further state the following:

109.   As citizens of the United States, Plaintiffs' Minors and Decedents were entitled to all rights, privileges, and immunities accorded to all citizens of the State of Michigan and of the United States.

110.   Pursuant to the 14th Amendment of the United States Constitution, at all times relevant to the Complaint, Plaintiffs' Minors and Decedents had a clearly established right to be free from danger created or increased by the Defendants.

111.   At all times relevant to this Complaint, the Oxford Defendants, were acting under the color of state law and created or increased a state created danger by substantially increasing the risk of harm to Plaintiffs' Minors and Decedents and in reckless disregard to Plaintiffs' Minors safety, thereby increasing the risk that Plaintiffs' Minors would be exposed to E.C.'s acts of violence.

112.   That actions by Oxford Defendants under the 14th Amendment to the United States Constitution, as well as 42 U.S.C. §1983 and §1988 were all

performed under the color of state law and were objectively unreasonable and performed knowingly, deliberately, and indifferently to Plaintiffs' Minors and Decedents and in reckless disregard to their safety.

113.   Defendants were acting under the color of state law when they deprived Plaintiffs' and their Decedents of their clearly established rights, privileges, and immunities in violation of the 14th Amendment of the Constitution of the United States, and of 42 U.S.C. §1983 and §1988.

114.   Each individual Oxford Defendant exhibited deliberate indifference, pursuant to the 14th Amendment to the United States Constitution, by taking affirmative actions resulting in the students and Plaintiffs' Minors and Decedents in particular being less safe than they were before the action of each and every individual Defendant. Their actions created the danger and increased the risk of harm that their students would be exposed to private acts of violence, to wit:

   a. Deliberately, intentionally, and recklessly returning E.C. to class on November 30, 2021, despite having knowledge of E.C.'s concerning suicidal or homicidal behavior;

   b. Deliberately, intentionally, and recklessly returning EC to class on November 30, 2021, where he had access to a loaded Sig Saur 9 mm semi-automatic handgun;

   c. Deliberating, intentionally, and recklessly deciding to not involve liaison officer or other local law enforcement in investigation despite EC's concerning behavior;

   d. Deliberately, intentionally, and recklessly decided to not search E.C.'s

24

backpack which contained the shooting weapon and/or involve appropriate police authorities so that a proper and lawful search of E.C.'s backpack could be performed;

e. Deliberately, intentionally, and recklessly deciding not to report E.C.'s internet search history for ammunition to proper police authorities the day before the shooting;

f. Deliberately, intentionally, and recklessly deciding to not report E.C.'s child abuse and neglect to Child Protective Services;

g. Interviewing E.C.'s in front of his parents, knowing that interview would accelerate the violence planned;

h. Failing to insist on removing E.C. from school property after credible threat of suicidal and/or homicidal ideation.

i. Other acts or omissions to be revealed through discovery.

115.   All of the above alleged conduct substantially increased the risk of harm to Plaintiffs' Minors and their Decedents, who were safer before Defendants took the affirmative acts described herein.

116.   The above-described conduct of Oxford Defendants were the proximate cause of T.M. and J.S.'s injuries and damages, including but not limited to:

a. Painful death by gunshot wounds;

b. Fright, shock, and terror leading up to the shooting;

c. Conscious pain and suffering;

d. Emotional distress;

e. Past and future wage loss and earnings capacity;

25

     f.  Punitive damages;

     g.  Exemplary damages;

     h.  All damages allowable under Michigan Wrongful Death Act, MCL 600.2922.

     i.  Attorney fees and costs pursuant to 42 U.S.C. §1988;

     j.  Any other damages allowed by law.

     k.  Any other damages revealed through discovery.

117.   The above-described conduct of Oxford Defendants were the proximate cause of K.G., A.S., S.K., Lauren Aliano, Buck and Sheri Myre, Chad Gregory, and Laura Lucas, and injuries and damages, including but not limited to:

     a.  Fright, shock, and terror;

     b.  Conscious pain and suffering;

     c.  Emotional distress;

     d.  Mental anguish;

     e.  Post-Traumatic Stress Disorder;

     f.  Depression and anxiety;

     g.  Disruption of her life;

     h.  Humiliation and/or mortification;

     i.  Past and future medical expenses;

      j.  Past and future wage loss and earnings capacity;

      k.  Punitive damages;

      l.  Exemplary damages;

      m. Attorney fees and costs pursuant to 42 U.S.C. §1988;

      n.  Any other damages allowed by law;

      o.  Any other damages revealed through discovery.

WHEREFORE, the Plaintiffs, request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, in any amount in excess of $ 75,000, together with interest, costs and attorneys' fees, as well as punitive and/or exemplary damages.

## COUNT II: ALL PLAINTIFFS AGAINST THE OXFORD DEFENDANTS FOR VIOLATION OF CIVIL RIGHTS UNDER THE FOURTEETH AMENDMENT TO THE CONSTITUTION AND 42 U.S.C. § 1983, 1988 – SUPERVISORY LIABILITY OF TIMOTHY THRONE AND STEVEN WOLF

118.   The Plaintiffs reallege, restate, and incorporate by reference each and every paragraph stated above, as though fully state herein, and further state the following:

119.   At all times relevant to this Complaint, Defendant, Timothy Throne, was the Superintendent at OCSD, and directly supervised and oversaw the actions

of Defendants, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, and encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, and providing proper supervision for E.C. and informing liaison officer or local law enforcement about EC's violent plans.

120.   At all times relevant to this Complaint, Defendant, Timothy Throne, was the Superintendent at OCSD, and directly supervised and oversaw the actions of Defendants, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, and encouraged the specific incident of misconduct or directly participated in it by discoursing the reporting, sharing, or mentioning of threats against OHS.

121.   At all times relevant to this Complaint, Defendant, Steven Wolf, was the principal at OHS, and directly supervised and oversaw the actions of Defendants, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, and encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, and providing proper supervision for E.C. and informing liaison officer or local law enforcement about E.C.'s violent plans.

122.   At all times relevant to this Complaint, Defendant, Steven Wolf, was

the principal at OHS, and directly supervised and oversaw the actions of Defendants, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, and encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, and providing proper supervision for E.C. and informing liaison officer or local law enforcement about E.C.'s violent plans.

123.   By inadequately training and/or supervising their teachers, counselors, and dean of students, and having a custom or policy of indifference to the constitutional rights of their citizens, and/or by failing to adequately supervise school shooter, E.C., Defendants, Throne and Wolf, encouraged and cultivated the conduct which then caused a violation of Plaintiffs' rights under the Fourteenth Amendments of the United States Constitution.

124.   By not expelling, disciplining, searching, or providing proper supervision for E.C., Defendants, Throne and Wolf, authorized, approved, or knowingly acquiesced in the unconstitutional conduct of Defendants, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski,

125.   Pursuant to the Fourteenth Amendment of the United States Constitution, at all times relevant to this Complaint, each of the Plaintiffs' Minors

and Decedents had a clearly established right to be free from dangers created by the Defendants.

126.  The actions and omissions of Defendants, Timothy Throne, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, under the 14th Amendment to the United States Constitution, as well as 42 U.S.C. §1983 and §1988 were all performed under the color of state law and were objectively unreasonable and performed knowingly, deliberately, and indifferently to Plaintiffs' Minors and Decedents and in reckless disregard for their safety.

127.  Defendants, Timothy Throne, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski were acting under the color of state law when they deprived Plaintiffs' Minors and Decedents of their clearly established rights, privileges, and immunities in violation of the 14th Amendment of the Constitution of the United States, and of 42 U.S.C. §1983 and §1988.

128.  The Oxford Defendants exhibited deliberate indifference pursuant to the 14th Amendment to the United States Constitution, to be free from acts that create the risk of harm and/or increase the risk of harm that an individual will be exposed to private acts of violence, to wit:

a.  Deliberately, intentionally, and recklessly returning E.C. to class on November 30, 2021, despite having knowledge of EC's concerning suicidal or homicidal behavior;

b.  Deliberately, intentionally, and recklessly returning E.C. to class on November 30, 2021, where he had access to a loaded Sig Saur 9 mm semi-automatic handgun;

c.  Deliberating, intentionally, and recklessly deciding to not involve liaison officer or other local law enforcement in investigation despite E.C.'s concerning behavior;

d.  Deliberately, intentionally, and recklessly decided to not search EC's backpack which contained the shooting weapon and/or involve appropriate police authorities so that a proper and lawful search of E.C.'s backpack could be performed;

e.  Deliberately, intentionally, and recklessly deciding not to report E.C.'s internet search history for ammunition to proper police authorities the day before the shooting;

f.  Deliberately, intentionally, and recklessly deciding to not report EC's child abuse and neglect to Child Protective Services;

g.  Interviewing E.C. in front of his parents, knowing that interview would accelerate the violence planned;

h.  Failing to insist on removing E.C. from school property after credible threat of suicidal and/or homicidal ideation.

i.  Deliberately choosing not to have appropriate mental health intervention for E.C. prior to returning him to his classroom with a Sig Saur 9 mm semi-automatic handgun;

j.  Demonstrating conduct so reckless that it shows a substantial lack of concern for whether any injury would result;

k.  Wrongfully causing Plaintiffs' Minors and Decedents to suffer extreme emotional distress;

l.  Enforced the deficient and faulty policies, procedures, and practices

set forth in Count III, infra, as well as those previously described in this Complaint.

m. Other acts or omissions to be revealed through discovery.

129.   The above-described conduct of Oxford Defendants were the proximate cause of T.M. and J.S.'s injuries and damages, including but not limited to:

a.   Painful death by gunshot wounds;

b.   Fright, shock, and terror leading up to the shooting;

c.   Conscious pain and suffering;

d.   Emotional distress;

e.   Past and future wage loss and earnings capacity;

f.   Punitive damages;

g.   Exemplary damages;

h.   All damages allowable under Michigan Wrongful Death Act, MCL 600.2922.

i.   Attorney fees and costs pursuant to 42 U.S.C. §1988;

j.   Any other damages allowed by law.

k.   Any other damages revealed through discovery.

130.   The above-described conduct of Oxford Defendants were the proximate cause of K.G., A.S., S.K., Lauren Aliano, Buck and Sheri Myre, Chad Gregory, and

Laura Lucas, injuries and damages, including but not limited to:

    a.  Fright, shock, and terror;

    b.  Conscious pain and suffering;

    c.  Emotional distress;

    d.  Mental anguish;

    e.  Post-Traumatic Stress Disorder;

    f.  Depression and anxiety;

    g.  Disruption of her life;

    h.  Humiliation and/or mortification;

    i.  Past and future medical expenses;

    j.  Past and future wage loss and earnings capacity;

    k.  Punitive damages;

    l.  Exemplary damages;

    m. Attorney fees and costs pursuant to 42 U.S.C. §1988;

    n.  Any other damages allowed by law;

    o.  Any other damages revealed through discovery.

WHEREFORE, the Plaintiffs, request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, in any amount in excess of $ 75,000, together with interest, costs and attorney fees, as well as

punitive and/or exemplary damages.

## COUNT III: 42 U.S.C. §1983 – MONELL LIABILITY AGAINST DEFENDANT OXFORD COMMUNITY SCHOOL DISTRICT

131.   The Plaintiffs reallege, restate, and incorporate by reference each and every paragraph stated above, as though fully state herein, and further state the following:

132.   At all times relevant to this Complaint, OCSD failed to adequately to train, discipline and supervise Defendants, Timothy Throne, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, promulgating and maintaining de facto unconstitutional customs, policies, or practices rendering them liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

133.   At all times relevant to this Complaint, OCSD knew or should have known that the policies, procedures, training, supervision and discipline of Defendants, Timothy Throne, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, were inadequate for the responsibility at hand.

134.   At all times relevant to this Complaint, OCSD knew or should have known that the policies, procedures, training, supervision and discipline of

Defendants, Timothy Throne, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski, failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that their actions or omissions did not create or increase the risk that Plaintiffs' Minors and Decedents would be exposed to from private acts of violence.

135.   At all times relevant to this Complaint, OCSD failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that their teachers, counselors, and other staff members do not take actions that create or increase a risk of harm to school district's students at OHS such as, Plaintiffs' Minors and Decedents.

136.   At all times relevant to this Complaint, OCSD knew or should have known, of a history, custom, propensity, and pattern for Defendants, Defendants, Timothy Throne, Steven Wolf, Nicholas Ejak, Shawn Hopkins, Pam Parker Fine, Jacqueline Kubina, Becky Morgan, and Allison Karpinski and other employees of OHS, to fail to properly identify a student with suicidal and homicidal tendencies and acted in such a way that created a risk of harm to OHS students and/or increased a risk of harm to OHS students, such as Plaintiffs' Minors' and Decedents.

137.   OCSD explicitly and implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the strong likelihood that constitutional

violations, such as in the instant case, would occur, and pursued policies, practices, and customs that were a direct and proximate cause of the deprivations of Plaintiffs' Minors' and Decedents constitutional rights.

138.   At all times relevant to this Complaint, OCSD knew that its policies, procedures, customs, propensity and patterns of supervising a student with suicidal and homicidal tendencies would deprive citizens, such as Plaintiffs' Minors and Decedents of their constitutional rights.

139.   At all times relevant to this Complaint, OCSD knew that its policies, procedures, customs, propensity and patterns allowed or provided discretion to principals, counselors, and teachers to return a student with suicidal and homicidal tendencies to his classroom such that their actions created a risk of harm and/or an increased risk of harm to the students at OHS before getting the liaison officer or other local law enforcement involved and obtaining permission from the same.

140.   Upon information and belief, OCSD had a policy, which allowed or provided discretion to principals, counselors and teachers to return a student with suicidal or homicidal tendencies to his classroom such that he could effectuate a massacre.

141.   Upon information and belief, OCSD had a policy, which allowed or provided discretion to principals, counselors and teachers to not immediately report

known or suspected acts of child abuse or neglect, in contravention of Michigan law.

142. By inadequately training and/or supervising their principals, counselors, and teachers, and having a custom or policy of deliberate indifference to the constitutional rights of their citizens, OCSD encouraged and cultivated the conduct which violated Plaintiffs' Minors' and Decedent's rights under the 14th Amendment of the United States Constitution, thereby increasing the risk that Plaintiffs' Minors and Decedents would be exposed to E.C.'s acts of violence.

143. The above-described conduct of Oxford Defendants were the proximate cause of T.M. and J.S.s injuries and damages, including but not limited to:

a. Painful death by gunshot wounds;

b. Fright, shock, and terror leading up to the shooting;

c. Conscious pain and suffering;

d. Emotional distress;

e. Past and future wage loss and earnings capacity;

f. Punitive damages;

g. Exemplary damages;

h. All damages allowable under Michigan Wrongful Death Act, MCL 600.2922.

i. Attorney fees and costs pursuant to 42 U.S.C. §1988;

    j.  Any other damages allowed by law.

    k.  Any other damages revealed through discovery.

144.  The above-described conduct of Oxford Defendants were the proximate cause of K.G., A.S., S.K., Lauren Aliano, Buck and Sheri Myre, Chad Gregory, and Laura Lucas, injuries and damages, including but not limited to:

    a.  Fright, shock, and terror;

    b.  Conscious pain and suffering;

    c.  Emotional distress;

    d.  Mental anguish;

    e.  Post-Traumatic Stress Disorder;

    f.  Depression and anxiety;

    g.  Disruption of her life;

    h.  Humiliation and/or mortification;

    i.  Past and future medical expenses;

    j.  Past and future wage loss and earnings capacity;

    k.  Punitive damages;

    l.  Exemplary damages;

    m. Attorney fees and costs pursuant to 42 U.S.C. §1988;

    n.  Any other damages allowed by law;

o.  Any other damages revealed through discovery.

WHEREFORE, the Plaintiffs, request that this Honorable Court enter judgment in their favor and against Defendants, jointly and severally, in any amount in excess of $ 75,000, together with interest, costs and attorney fees, as well as punitive and/or exemplary damages.


Respectfully Submitted

JOHNSON LAW, PLC
Attorneys for Plaintiffs

By:   _/s/ *Ven R. Johnson*____
VEN R. JOHNSON (P39219)
JEFFREY T. STEWART (P24138)
KANWARPREET S. KHAHRA (P80253)
535 Griswold St. Ste 2600
Detroit, MI 48226
(313) 324-8300
vjohnson@venjohnsonlaw.com
jstewart@venjohnsonlaw.com
kkhahra@venjohnsonlaw.com

Dated:  May 26, 2022

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

WILLIAM MYRE, and SHERI MYRE,
as co-personal representatives of the Estate
of T.M., *Deceased*,

CRAIG SHILLING, and JILL SOAVE,
as co-personal representatives of the Estate of
J.S., *Deceased;*

CHAD GREGORY, as Next Friend for
K.G., a minor,

LAUREN ALIANO, as Next Friend for S.K.,
a minor and G.K., a minor,

LAURA LUCAS, as Next Friend for A.S.,
a minor,

             Plaintiffs,

v.

OXFORD COMMUNITY SCHOOL DISTRICT;
SUPERINTENDENT TIMOTHY THRONE;
PRINCIPAL STEVEN WOLF; DEAN OF
STUDENTS NICHOLAS EJAK;
STUDENT COUNSELOR SHAWN HOPKINS;
SUPERINTENDENT KENNETH WEAVER;
TEACHER PAM PARKER FINE; TEACHER
JACQUELINE KUBINA; TEACHER
BECKY MORGAN; and TEACHER ALLISON
KARPINSKI.

             Defendants.

Case No.: 2:22-cv-11113

U.S District Judge:
Mark A. Goldsmith

U.S. Magistrate Judge:
Anthony P. Patti

_____/

VEN JOHNSON (P39219)
JEFFREY T. STEWART (P24138)
KANWARPREET S. KHAHRA (P80253)
CHRISTOPHER DESMOND (P71493)

JOHNSON LAW, PLC
Attorneys for Plaintiffs
535 Griswold St. Ste 2600
Detroit, MI 48226
Ph: (313) 324-8300/ Fax: 8301
vjohnson@venjohnsonlaw.com
jstewart@venjohnsonlaw.com
kkhahra@venjohnsonlaw.com
cdesmond@venjohnsonlaw.com
_____/

**DEMAND FOR JURY TRIAL**

NOW COME, the Plaintiffs, WILLIAM MYRE and SHERI MYRE, as co-personal representatives of the Estate of T.M., *Deceased*; Craig Shilling and Jill Soave, as co-personal representatives of the Estate of J.S., *Deceased*; CHAD GREGORY, as Next Friend for K.G., a minor; LAUREN ALIANO, as Next Friend for S.K., a minor, and G.K., a minor; LAURA LUCAS, as Next Friend for A.S., a minor, by and through their attorneys, JOHNSON LAW, PLC, and hereby demand a jury trial in the above-referenced matter.

Respectfully Submitted
JOHNSON LAW, PLC
Attorneys for Plaintiffs
By: __/s/ *Ven R. Johnson*____
VEN R. JOHNSON (P39219)
JEFFREY T. STEWART (P24138)
KANWARPREET S. KHAHRA (P80253)
535 Griswold St. Ste 2600
Detroit, MI 48226
(313) 324-8300
vjohnson@venjohnsonlaw.com
jstewart@venjohnsonlaw.com
Dated: May 26, 2022      kkhahra@venjohnsonlaw.com